**In re LANDQUIST et al.**

**HARDENBROOK et al. v. LANDQUIST et al.**

**In re PARMENTER.**

**FELSENTHAL et al. v. PARMENTER.**
Nos. 5133, 5034, 5046.

Circuit Court of Appeals, Seventh Circuit.
May 3, 1934.

Rehearing Denied June 25, 1934.

930

Edward Sonnenschein, Herbert M. Lautmann, Henry S. Moser, and Ben I. Greenebaum, Jr., all of Chicago, Ill., for appellants.

Walter E. Wiles, of Chicago, Ill. (George E. Q. Johnson, Luther D. Swanstrom, and Samuel G. Clawson, all of Chicago, Ill., of counsel), for appellees.

Before ALSCHULER, SPARKS, and FITZHENRY, Circuit Judges.

SPARKS, Circuit Judge.

These cases, by agreement of the parties were consolidated in this court for the purpose of argument. In the discussion we shall refer first to No. 5133, Hardenbrook v. Landquist.

The questions presented arise out of the court's ruling with respect to a petition filed by appellees in the District Court, sitting as a court of bankruptcy. The petition was filed pursuant to section 74 of the Bankruptcy Act as amended March 3, 1933 (11 USCA § 202), and alleged that appellees as co-partners and individuals were unable to meet their debts as they matured, and that they desired to obtain an extension of time in which to pay them. With the petition were filed schedules which showed liabilities in excess of assets. The principal asset was an undivided interest in real property. The principal liability was a mortgage indebtedness in the sum of $92,000 evidenced by bonds executed by appellees and one Danielson and wife, which were secured by a first mortgage deed duly recorded, conveying the aforesaid real property in trust.

The court approved the petition and made a general reference of the cause to a referee in bankruptcy. Appellees then filed a petition alleging that the names and addresses of the owners and holders of the bonds were to them unknown and that appellants were in possession of records showing that information, and they prayed for a subpœna duces tecum directing appellants to produce all records in their possession which would disclose the names and addresses of all persons to whom said bonds were originally sold, the names and addresses of the assignees and transferees of such persons, and the amounts and numbers of bonds owned and held by each, together with all copies, drafts and vouchers relating to them. Answer being filed, a hearing was had, and over appellants' objection the subpœna was issued as prayed, and served upon appellant Hardenbrook. Appellants then filed a petition to quash the subpœna alleging that they were members of a committee of which one of their number was secretary, under a deposit agreement which was exhibited; that pursuant to a call for deposit of the outstanding unpaid bonds there had been deposited with the committee, bonds in the aggregate of $60,900, of which appellants were the legal owners and holders and were creditors of appellees to that extent; that appellees were not entitled to the information contemplated by the subpœna because it was not pertinent nor material to the issues and would not disclose the names and addresses of appellees' creditors other than appellants, and would be of no avail to appellees; that the underwriters who originally sold the bonds had been for many years past, and their successor was then, engaged in selling securities to the public, and their lists of customers constituted a property right of great value, and to require a disclosure of them would deprive appellants and said underwriters of property without due process of law in violation of the Fifth Amendment of the Federal Constitution; that appellees were not in good faith in seeking the information, but were actuated by ulterior motives in attempting to promote their personal gain by thus hindering and delaying the reorganization of the property involved. The motion to quash further alleged that section 74 of the Act, in so far as it attempts to bring within the jurisdiction of the federal bankruptcy court the obligations and property of persons not insolvent, merely for the purpose of extending the time for payment of their debts, contravenes article 1, sections 1 and 8, article 3, section 1, and the Fifth and Tenth amendments of the Federal Constitution.

The referee found the facts specially and denied and dismissed appellants' petition to quash for want of equity. Upon appellants' petition to review that ruling, the District Court affirmed the order of the referee and from that order this appeal is prosecuted. The facts are not controverted and the questions presented are (1) whether section 74 of the Bankruptcy Act contravenes the Federal Constitution, and (2) was the subpœna duces tecum rightfully issued.

Section 8, article 1 of the Constitution of the United States provides that Congress shall have power to establish uniform laws on the subject of bankruptcies throughout the United States, and it is conceded that the power of Congress to pass the amendment of 1933, if it had such power, must be based on that section. It will be noted that section 74 provides that any person, except a corporation, who is insolvent *or unable to meet his debts as they mature* may avail himself of the statute with respect to a composition of his debts, or an extension of time in which to pay them. The purpose of the amendment, as stated therein, is for the relief of debtors, and is in addition to voluntary and involuntary proceedings in bankruptcy. It is contended by appellants that the matter of extension of time for the payment of debts by an embarrassed debtor is not germane to and cannot' be included in the subject of bankruptcies, hence they say there was no warrant of law for the enactment of section 74. It will be noted that in appellants' answer to the petition for the subpœna, the constitutional challenge is based upon the attempted grant of power to all debtors named in section 74, while in their motion to quash the subpœna the challenge is to such grant to debtors who are not insolvent. It is not denied, however, that appellees were insolvent, and were unable to meet their debts as they matured.

The history of bankruptcy legislation has provoked much discussion as to the meaning of the words "bankrupt" and "bankruptcy legislation." Owing to the difference in purpose of the several acts, and in the limitations in the various enactments with respect to the persons entitled to their benefit, the legislative meaning of the words has not always been the same in all jurisdictions or in all ages. Mr. Justice Story in his comment on the bankruptcy provision of the Constitution, as quoted in Re Reiman, Fed. Cas. No. 11,673, at page 493, stated, "Perhaps, as satisfactory a description of a bankrupt law as can be framed is, that it is a law for the benefit and relief of creditors and their debtors, in cases in which the latter are unable or unwilling to pay their debts. And a law on the subject of bankruptcies, in the sense of the constitution, is a law making provisions for cases of persons failing to pay their debts." It is not necessary for us to say that mere unwillingness, or mere failure to pay his debts has ever been sufficient under our laws to entitle a debtor to the benefit of a bankruptcy act, but we do say that, except under the act of 1867 (14 Stat. 517), inability to pay has always been recognized as a proper cause for the adjudication whether that inability were caused by a lack of assets or a lack of liquidity of assets. The Bankruptcy Act of 1898, of which the enactment of 1933 is an amendment, expressly recognized this principle. 11 USCA §§ 1 and 21; In re Hargadine-McKittrick Dry Goods Co. (D. C.) 239 F. 155 (reversed on other points [C. C. A.] 244 F. 719); In re Foster Paint & Varnish Co. (D. C.) 210 F. 652. It is clear that appellees at the time of filing their petition were bankrupts within the meaning of the law, and that Congress was empowered by the Constitution to enact such bankruptcy legislation as it might deem proper for the benefit and relief of all persons so situated and their creditors, providing the enactment were uniform throughout the United States.

The principal contention of appellants, however, is, that legislation which does not provide for pro rata distribution of a bankrupt's property among his creditors, and for the discharge of the bankrupt from liability for his existing debts, is in fact not bankruptcy legislation. This contention is based on the illogical assumption that the broad power of the Constitution is limited by congressional legislation on the subject of bankruptcy since the Constitution was adopted. In other words it is argued in substance that because Congress has heretofore provided that after adjudication there shall be a pro rata distribution of the net assets and a discharge of the debtor, further legislation can not be classified as bankruptcy legislation unless it contains those provisions, or is in aid of them. The history of bankruptcy legislation both in England and the United States does not support this position. The earlier laws of England granted no discharge from existing debts, and limited the persons who might be declared bankrupts to traders, merchants, and dealers in money. Voluntary bankruptcy of the debtor was not permitted. In many instances less than a full disclosure of assets was allowed. It was more than one hundred sixty years after the first English bankrupt-

cy statute was enacted that a discharge of the bankrupt was granted, and it was not until a hundred twenty years later that a composition statute similar to our own was enacted as a part of their bankruptcy statutes.

Under our Constitution the first bankruptcy statute was enacted in 1800 (2 Stat. 19) and was repealed in 1803 (2 Stat. 248). In all respects it was quite similar to the British act in force at the time, and was framed along the lines of suppressing fraudulent and criminal practices. Indeed it was an act against the bankrupt rather than in his favor, and it was limited to traders, merchants, underwriters and brokers, and voluntary proceedings were not permitted. The next enactment was in 1841 (5 Stat. 440) and was repealed in 1843 (5 Stat. 614). It permitted voluntary bankruptcy, required a full disclosure of assets, and provided a general system for administering the insolvent estates of any living persons except those under guardianship. This was followed by the act of 1867 (14 Stat. 517) which provided that a debtor should not be held to be insolvent unless his liabilities exceeded the fair value of his assets. The purpose of this act was to avoid the wholesale filing of involuntary petitions during the post Civil War period. In 1874 (18 Stat. 178) this act was amended by adding a composition statute, and the original act with its amendments was repealed in 1878 (20 Stat. 99). From that time we had no federal bankruptcy law until 1898 (11 USCA § 1 et seq.) at which time the law was enacted which we now have with the exception of several amendments, none of which are pertinent to this controversy save the amendment of 1933. The present body of federal law on this subject is the result of a gradual growth and development and it is obvious that the object of all of it, for more than ninety years at least, has been the benefit and relief of creditors and debtors in cases where the debtors are unable to pay their debts, and the Constitution is sufficiently broad to authorize the use of any reasonable means for the accomplishment of this purpose, so long as the means are uniform in their application.

In making laws necessary and proper to carry into execution the powers vested by the Constitution, Congress possesses the choice of means and may use any which are in fact conducive to the exercise of such powers. In the Matter of Edward Klein, 1 How. (42 U. S.) 277 (opinion by Mr. Justice Catron sitting as a Circuit Judge). See, also, United States v. Fisher, 2 Cranch (6 U. S.) 358, 2 L. Ed. 304; McCulloch v. Maryland,

4 Wheat. (17 U. S.) 316, 4 L. Ed. 579; Legal Tender Cases, 12 Wall. (79 U. S.) 457, 20 L. Ed. 287. In Sturges v. Crowninshield, 4 Wheat. 122, 195, 4 L. Ed. 529, Chief Justice Marshall, speaking of the scope of power granted by the 8th section of article 1 of the Constitution, said, "The bankrupt law is said to grow out of the exigencies of commerce, and to be applicable solely to traders; but it is not easy to say who must be excluded from, or may be included within, this description. It is, like every other part of the subject, one on which the Legislature may exercise an extensive discretion."

Appellants rely upon the case, In re Klein, supra, as supporting a contrary doctrine, but we think it does not. That case unsuccessfully attacked the constitutionality of the act of 1841 in which the provisions of the law were enlarged to extend to persons other than traders and permit the filing of voluntary as well as involuntary petitions. Mr. Justice Catron in that opinion expressly refrains from defining the words, "bankruptcy" and "the subject of bankruptcies." He says:

"* * * Congress has general jurisdiction; and the true inquiry is—To what limits is that jurisdiction restricted?

"I hold, it extends to all cases where the law causes to be distributed, the property of the debtor among his creditors: this is its least limit. Its greatest, is a discharge of the debtor from his contracts. And all intermediate legislation, affecting substance and form, but tending to further the great end of the subject—distribution and discharge—are in the competency and discretion of Congress."

It is obvious that section 74 provides for a distribution of the debtor's assets, and the extension of time merely affects the form and substance of that distribution. It is also apparent that the section tends to further the debtor's discharge from his debts, either by payment or by decree of the bankruptcy court on a pro rata distribution. Moreover, it must be remembered that Justice Catron was speaking at a time when the act of 1841 was in force. That law, it is true, provided for a pro rated distribution and discharge, but it can not be said that those provisions constituted any part of the definition of the word bankruptcy; they were rather favors and benefits granted the creditor and debtor as a result of bankruptcy, which even now can be modified by Congress. It is quite obvious that much of the difference of opinion with respect to the meaning of the word

has been occasioned by trying to define it in terms of past legislation rather than by the root meaning of the word and the broad terms of the Constitution, when in fact no bankruptcy law of this country has ever purported to absolutely and unalterably limit its meaning. Where plenary power is given by the Constitution, and Congress sees fit to use only a part of it, that fact will not prevent Congress from exercising the full power whenever it chooses to do so. That principle was invoked when our composition statute was enacted as a part of the Bankruptcy Act. It was vigorously attacked for reasons the same as those assigned here or analogous to them, and it was held constitutional. In re Reiman (D. C.) Fed. Cas. No. 11,673, and Id. (C. C.) Fed. Cas. No. 11,675. It is obvious from a reading of the other cases relied upon by appellants that they involve the scope and construction of legislative acts rather than the constitutional provision.

The amendment of 1933 contemplates more than the extension of time to the debtor in which to pay his debts. It also provides for carrying out of bankruptcy proceedings in case the debtor fails to perform the conditions imposed upon him by the court. The extension is merely intended as a means of relief by which, if possible, the debtor may be financially rehabilitated and his creditors eventually benefited, and we are convinced that those means as provided in section 74 may be properly classified as bankruptcy legislation, and are not violative of section 8 of article 1 of the Constitution, nor of the Tenth Amendment.

It is next contended that section 74 (e), 11 USCA § 202 (e) constitutes an improper delegation of legislative and judicial authority in contravention of article 1, section 1, and article 3, section 1 of the Constitution.

Section 12b of the Act of 1898 (11 USCA § 30 (b) provided for the debtor's application for a composition in the following manner:

"An application for the confirmation of a composition may be filed in the court of bankruptcy after, but not before, it has been accepted in writing by a majority in number of all creditors whose claims have been allowed, which number must represent a majority in amount of such claims, and the consideration to be paid by the bankrupt to his creditors, and the money necessary to pay all debts which have priority and the cost of the proceedings, have been deposited in such place as shall be designated by and subject to the order of the judge."

An analogous section of the act of 1874 was held to be constitutional in Re Reiman, supra. Appellants contend, however, that section 74 (e) is unlike section 12 in that under the former section an offer in composition or extension may not be presented to the court for its approval until a majority in number and amount of the creditors have consented in writing to such offer, and that the discretion of the creditors in determining whether such proposal shall be submitted to the court for approval is uncontrolled by any prescribed standard or rule. This contention is without merit. Both sections prevent the filing of an application to the court for confirmation of the offer of composition until it has been accepted in writing by a majority of certain creditors, which number must represent a majority in amount of the claims of such creditors. The difference in the two sections in this respect is that section 12 of the original act contemplated a majority in number and amount of the allowed unsecured claims, while section 74 of the act as amended, in addition to those claims also includes all secured claims which are proposed to be affected by the debtor's proposal. The power of Congress to legislate on the subject of bankruptcies is plenary and may be exercised with respect to all classes of creditors, and the enactments are valid with respect to the objections now under discussion. We are convinced that section 74 (e) delegates no legislative or judicial power to either debtors or creditors. It merely gives the court upon application of the debtor, the right to approve and enforce an extension of time in which to pay debts, or a composition of debts, provided a consent is obtained from a majority in number and in amount of the debts. It is obvious that a creditor in exercising a choice of whether he shall accept or reject the proposal involves neither legislative nor judicial power, and requires no legislative standard or rule by which that choice is to be governed.

It is further contended by appellants that section 74 contravenes the due process clause of the Constitution in that it deprives secured creditors of the opportunity of proceeding against persons liable on the debt, who would be released from liability by an extension of time to which those persons, such as sureties or guarantors, were not parties. But section 76 of the amendment (11 USCA § 204) provides that extensions granted under 74 shall extend the obligation of any person who is secondarily liable for the debt and that a certified copy of the order of extension shall be sufficient evidence of

that fact. That section is ample to protect the estate of any other creditor from loss in that respect. Its constitutionality is not attacked in this proceeding and we do not pass on that question.

■■ The next question presented by appellants is whether the court was authorized by law to issue the subpœna duces tecum. The power to issue the subpœna is derived from section 21 of the Bankruptcy Act, 11 USCA § 44, which provides for the examination, before the court or referee, of the bankrupt or other persons possessing knowledge relating to the action, conduct or property of the bankrupt. That section has been construed to include the right to examine such books and written instruments in the possession of witnesses which relate to bankruptcy acts, conduct, or property. In re Wheeler & Co. (C. C. A.) 158 F. 603; In re Sully (D. C.) 142 F. 895; Id. (C. C. A.) 152 F. 619; In re Fixen & Co. (D. C.) 96 F. 748; In re Davis Tailoring Co. (D. C.) 144 F. 285. It has been held to authorize the court to order a secured creditor to submit to examination. In re Abbey Press (C. C. A.) 134 F. 51. It has also been held to subject to examination by the court, a non-resident creditor who had brought himself within the jurisdiction of the court by filing a claim against the bankrupt. In re Kyler, Fed. Cas. No. 7,956. It has also been held to require a witness to testify concerning matters personal to himself and revealing his own private business affairs. In re Trask, Fed. Cas. No. 14,141; In re Standard Aero Corporation of New York (C. C. A.) 270 F. 783. Whether the production of books and written instruments as required by the subpœna might be unduly harmful to the possessor is a matter that could well be addressed to the discretion of the court after the production. The court would of course give it such consideration as would promote justice, and protect the interests of all parties concerned, so far as reasonably possible. In re Ironclad Mfg. Co. (C. C. A.) 201 F. 66; In re Hark (D. C.) 136 F. 986. The materiality as evidence of the documents produced should be left to the court and not to the witnesses producing them.

The motion to quash is based also on the contention that when appellants delivered the deposit certificates to the original bondholders in exchange for the bonds, the appellants became the owners of the bonds by virtue of the sale provision of the so-called bondholders' agreement. We quite agree with appellants that the language used more nearly imports a sale than any other form of transfer. It essayed to transfer the legal, equitable, and beneficial interest of the bondholders and, if valid, left no beneficial interest whatever in the bondholders upon which a trust could be based. The lack of consideration, however, is fatal to appellants' contention in this respect. The agreement was replete with grants of discretionary power to the committee but it imposed upon that committee no obligations or duties whatever, and if perchance it subsequently chose to exercise any of the powers granted, its actions in the premises were binding upon the depositors with no responsibility upon the committee except for actual bad faith in the exercise of its powers.

In Bullard v. Cisco, 290 U. S. 179, 54 S. Ct. 177, 78 L. Ed. 254, a bondholders' deposit agreement was considered by the court which in many respects was quite similar to the one now before us. It differed in other respects, however, notably in this, that it purported merely to transfer the legal title of the bonds and left the beneficial interest in the depositors. Appellants who were not residents of Texas were members of the committee and instituted an action at law against the city of Cisco, Texas, in the federal District Court of that state to recover on the bonds and coupons. After all the evidence was heard the District Court dismissed the complaint for lack of jurisdiction because only three owners of the bonds were shown to have severally deposited more than $3,000 of those sued upon and they were not segregated or identified by the evidence. That court further held that the committee received the bonds merely as a collection agency and were not the real owners. The Circuit Court of Appeals in the main affirmed the District Court but reversed the case with instructions to identify and retain jurisdiction of the three claims which exceeded $3,000 in value. The Supreme Court held that the purpose of the deposit agreement was to create a trust by virtue of which the appellants could maintain the action, and reversed both judgments, remanding the cause to the District Court for further proceedings. Under the ruling in that case appellants now contend that they are trustees in possession and that therefore neither the appellees nor the depositors have actual or constructive possession of the property, and the depositors are not creditors as contemplated by the statute. We think the Cisco Case does not go that far. The point there decided was that the bondholders' agreement created a trust, and by virtue of it a committee held such title as enabled it to sue the promisor of the bonds, in the fed-

eral court, and that the bondholders were not necessary parties. The possession of the mortgaged property we think was such as is fairly contemplated by section 74 (h) of the enactment, 11 USCA § 202 (h), which provides that the terms of the extension may operate on secured debts the security for which is in the actual or constructive possession of the debtor or of the custodian or receiver.

The court in the Cisco case did not hold that the bondholders were not proper parties, and we think it must be conceded that they were because of their beneficial interest in the bonds under the trust, and·to that extent they were creditors of the city. Likewise the depositing bondholders in this case are creditors of appellees regardless of whether there was a trust created. It was held, however, by a District Court of this circuit in Re Kenney Co., 136 F. 451, that a bondholders' committee, under an agreement there in issue, were trustees owning the legal title and as such were the only persons who could file claims on the obligations so held in trust by them. That ruling, however, was under section 63 of the Bankruptcy Act (11 USCA § 103), which limited provable equitable claims to those which were liquidated, and inasmuch as the depositor of securities with the committee had only an equitable interest which was not liquidated, the court held that he could file no claim and was not a creditor under that section. Section 74(a) of the amendment of 1933, 11 USCA § 202(a), however, states that the term "creditor" shall include for the purpose of the extension proposal all holders of claims of whatever character against the debtor or his property including a claim for future rent, whether or not such claims would otherwise constitute a provable claim under the title. We are convinced, therefore, that with respect to the court's ruling on the motion to quash the subpœna, it makes no difference whether the deposit agreement created a trust relationship, for in any event the depositing bondholders are such creditors of the bankrupt as section 74 contemplates, and appellees are entitled to submit their extension proposal to all their creditors regardless of whether it be accepted or not. It is at least doubtful whether ·appellees may have the right to contest the validity of the depositors' agreement when it comes to a determination of who shall vote on the matter of extension, but with that question we are not now concerned. It is possible that the disclosures of the subpœna may throw further light upon the meaning and effect of the depositors' agreement, and the character of appellants' title. The

agreement itself will not preclude appellees from having a full and fair investigation of the entire transaction in order that the court may determine who are their creditors. It is not inconceivable that the depositing bondholders may ask and be permitted to intervene and attack the validity of the agreement, and again they may not desire to do so. It is quite obvious that if the depositors are of the same opinion as appellants, the court will be powerless to grant an extension, but that will not now prevent appellees from having a full investigation and a judicial determination of that fact. There was no error in denying and dismissing the motion to quash, and the decree of the District Court is affirmed.

■■■■■ In the Parmenter case, foreclosure proceedings had been instituted in the state court, and a receiver had been appointed. The mortgagor had surrendered possession of the mortgaged premises to the trustee under the trust deed, and he in turn had delivered possession of the· property to the receiver more than four months prior to the filing of appellee's petition for an extension. Since that time the receiver had had continuous and uninterrupted possession and control of the property under the jurisdiction and authority of the state court in the foreclosure proceedings. The District Court on appellee's petition had restrained the prosecution of the foreclosure proceedings and issued a subpœna duces tecum in all respects similar to the one in the case of Hardenbrook v. Landquist.

Actual or constructive possession of the security by the debtor is a prerequisite to relief under section 74 of the Bankruptcy Act. It is conceded that appellee was not in actual possession, and the question presented here, but not present in the Landquist case, is whether at the time of filing the petition for extension, appellee Parmenter was in constructive possession of the mortgaged property. We are convinced that this question must be answered in the negative.

The general principles governing our decision in this case are stated in volume V of Remington on Bankruptcy (3d Ed.) sections 2042, 2067, and 2077, as follows:

"Where property, afterwards claimed by the bankruptcy trustee, is taken into the custody of the State court * * before the bankruptcy petition was filed, the State court * * continues to retain jurisdiction over the entire matter, except in three instances * * * and the only thing for the trustee to do is to get himself admitted as a party

into the case in the State court and to litigate his rights there. For the rule of law that the Court first obtaining jurisdiction over the 'res' retains it to the end, prevails in bankruptcy as well as in every other jurisprudence"—citing Pickens v. Roy, 187 U. S. 177, 23 S. Ct. 78, 47 L. Ed. 128.

(The exceptions to this rule) "First, where the possession of the State Court has itself created a lien by legal proceedings within four months of the bankruptcy whilst the debtor was insolvent; second, where a receiver, assignee or trustee appointed by the State Court within four months of the bankruptcy, is in possession; third, where the possession is under State Insolvency proceedings that are superseded by the Bankrupt Act."

"Unless bankruptcy proceedings are instituted within the prescribed four months after an assignment or receivership and adjudication of bankruptcy follows, the bankruptcy will not operate to supersede the control of the state court over the assignment or receivership proceedings, and the state court will retain jurisdiction over the property until its administration is completed."

Those principles as enunciated by Remington are abundantly recognized and supported quite generally by the decisions of the federal and state courts. Indeed we find none to the contrary. Appellee cites a number of cases in support of the contrary doctrine, but they do not appear to support the contention either in fact or inferentially. One of those cases is Gross v. Irving Trust Co., 289 U. S. 342, 53 S. Ct. 605, 77 L. Ed. 1243, but there the court premises its ruling upon the fact that the receivers were appointed by the state court within the four months period. It refers to that class of cases which hold that as between courts of *concurrent* jurisdiction, property already in the hands of a receiver of one of them cannot rightfully be taken from him, without that court's consent, by a receiver subsequently appointed by the other court. It holds, however, that a state court receiver appointed within four months of the filing of the petition in bankruptcy does not come within the rule because in that case the jurisdiction of the bankruptcy court is *paramount* to, and not *concurrent* with, the jurisdiction of the state court. So far as we know it has always been held that a bankruptcy court has no jurisdiction whatever over pledged security which has been transferred in good faith by a debtor to his creditor more than four months prior to the filing of the bankruptcy petition. It might be contended that, aside from the security, the bankruptcy court under section 74 is authorized to consider the extension of the due date of the debt. There are at least two reasons why that position is not tenable. First, the extension of the due date would defeat the jurisdiction of the state court and the right of the receiver to possession, because the fact that the debt is past due is sine qua non of that court's jurisdiction, and that fact has been adjudicated by the state court. Second, this is a secured debt, and before the debtor is entitled to ask for an extension, it must appear that he is in either actual or constructive possession of the security. We hold, under the circumstances here presented, that appellee was not in actual or constructive possession. If it be conceded that the bankruptcy court might take possession of the property had the state court receiver been appointed within the four months period, yet that would not support appellee's contention, because she allowed more than four months to elapse after abandonment and delivery of possession to the trustee under the trust deed before filing her petition, and it cannot be said that the receiver is now holding possession for her. The only right which appellee now has in the security is that of redemption. To hold otherwise, we think would extend the application of section 74 much further than was contemplated by Congress.

In causes No. 5034 and 5046, the decree of the District Court is reversed with respect to its holding that appellee was in constructive possession of the property when she filed her petition; and in failing to quash the subpœna duces tecum, and in enjoining the prosecution of the foreclosure proceedings.

There being liabilities other than those of appellants listed in appellee's schedule in which appellants are not interested, so far as the record discloses, they are not in a position to raise the question of constitutionality of the statute by their motion to dismiss the petition for extension.

Causes 5034 and 5046 are remanded with instructions to sustain appellants' motion to quash the subpœna duces tecum and to dissolve the restraining order and for further proceedings not inconsistent with this opinion.